Union Bank of Maryland *vs.* Edwards.—December, 1829.

The rule, that a court of equity will sometimes adopt a more liberal and enlarged construction than prevails at law, can never be tolerated, unless it be necessary to effectuate the motives which induced a contract.

Relief, by the doctrine of substitution, is never extended to a security, but upon the assumption that the creditor's debt has been, or is to be fully paid—that his further detention of the mortgaged property, is against equity and good conscience.

So where a mortgage was executed, for the purpose of securing the payment of all and every sum or sums of money, then owing, or which might thereafter be due and owing, from the mortgagor to the mortgagee, upon any promissory note, or notes negotiated or to be negotiated with the mortgagee, of which the mortgagor might be drawer, or endorser, or otherwise however, and upon sale of the mortgaged premises, the proceeds being insufficient to pay a note of the mortgagor's to the mortgagee, for which the latter had no other security than the mortgage; *it was held,* that an accomodation endorser on a note of the mortgagors, discounted by the mortgagee after the execution of the mortgage and before the sale, could not call upon a court of equity to distribute the fund above mentioned, rateably, in payment of both notes.

Appeal from the Court of Chancery. In this case a bill was filed on the 18th of December, 1822, by the appellants, against *William Stansbury,* for the sale of certain lots of ground in the city of *Baltimore,* mortgaged by him to them, on the 27th of July, 1822, for the purpose of securing the payment of all and every sum or sums of money then owing, or which might thereafter be due or owing from *Stansbury* to the *Union Bank,* upon any promissory note or notes negotiated, or to be negotiated at the said bank, which was or might be drawn or endorsed, or otherwise however; with a proviso, that if *Stansbury* should, when thereunto required, pay unto the said bank, all and every, the sum or sums of money then owing, or which might thereafter become due or owing from him to the said bank, either upon any promissory note or notes that had already been, or which might thereafter be negotiated at the said bank, of which he might be drawer, or endorser, or otherwise howsoever, then the said mortgage was to be void.   Such proceedings were had upon the said bill, on coming in of the answer, admitting the facts stated in the bill, and consenting to a decree

for the sale of the mortgaged premises, and that out of the proceeds of sale, the sum of $20,000 due to the complainants, with interest thereon, should be paid; that at December term, 1822, a sale was decreed; provided that not more than $19,258 be paid to the complainants. The property was sold by the trustee, appointed for that purpose, to the amount of $12,005 33, and the sales were ratified.

On the 10th of December, 1824, and also on the 21st of February, 1826, *Elizabeth Edwards* (the now appellee) filed her petitions. The first petition stated, that in the year 1822, she had loaned her name for a small amount to *William Stansbury,* and had either drawn or endorsed notes for his use and accommodation accordingly, which notes had been and were discounted by the *Union Bank.* That subsequently thereto, *Stansbury* wishing to obtain further discounts at said bank, and in order to secure the payment of all and every sum or sums of money, then due, or which might thereafter become due, and prevent any loss whatever, on the notes so loaned or endorsed by her, or by other persons, or which might thereafter be loaned by her or others, and discounted at said bank, did on the 27th of July, 1822, execute a deed of conveyance by way of mortgage to the said bank, whereby he conveyed to them his real estate, or the greater part thereof, which was large, and consisted of a variety or number of lots and improvements, situate in the city of *Baltimore.* That the said property was intended and expressed in the said deed to be conveyed for the purpose of securing the payment of all and every sum or sums of money, then due and owing, or which might thereafter become due or owing, from *Stansbury* to the said bank upon any promissory note or notes negotiated, or to be negotiated at the said bank, of which *Stansbury* might be the drawer or the endorser. That the understanding and intention of all the parties, being, that the said property should be responsible for all notes negotiated or to be negotiated, at the said bank for *Stansbury,* and the petitioner believing the said property to be valuable at the time, and sufficient to secure a large amount; and believing further, than in the event of a failure of *Stansbury* at any time to pay such notes, the said property would be sold, and the peti-

tioner and the other drawers and endorsers made responsible only for any deficiency (if any existed,) or that upon their paying such notes, the same could be assigned to them, she did not hesitate from time to time, to renew the notes which she had drawn or endorsed for *Stansbury* before said deed was executed, and also draw and endorse other notes in his favor, for his accommodation, which were discounted or continued at the said bank. The petition then stated the filing the bill by the bank and the sale of the property, &c. *Prayer*, that the proceeds of the sale may be applied to payment *pro rata* of the said notes held by the bank, and drawn and endorsed by *Stansbury*, &c. The last petition after referring to the proceedings which had taken place in this case, stated, that the said mortgage from *Stansbury* to the complainants, was designed and intended by the parties thereto, to secure all the notes discounted or negotiated at the *Union Bank*, for *Stansbury's* use, or in the event of its falling short of the whole amount, then upon a sale becoming necessary, that the proceeds should be applied rateably to the discharge of said notes. That the complainants now seek to apply the whole proceeds to the extinguishment of a particular debt, alleged by them to be due and owing to them from *Stansbury;* although the petitioner conceives the same is not embraced by the mortgage, and forms no part of the negotiated notes discounted for his use, and which alone were intended to be secured by the mortgage—*Prayer* that the auditor be directed to state an account excluding the present alleged claim of the complainants, and distributing and applying the proceeds to the payment of the notes negotiated by *Stansbury* at the said bank, and there discounted for his use and accommodation; and another account whereby the same funds shall be distributed and applied rateably to the alleged claim of the complainants, and to the notes negotiated and discounted for *Stansbury;* and that the complainants produce to the auditor the several original promissory notes held by them and discounted for the use of *Stansbury*, &c.

To this petition the complainants answered, stating among other things, that in the year 1822, and previous thereto, *Stans-*

*bury* was indebted to them to the amount of $15,000 and up-wards, upon certain promissory notes discounted by them for the use and benefit of *Stansbury;* and that on some of these notes made in the fall of the year 1822, the said *Elizabeth Ed-wards's* name appeared as drawer or endorser; that on the 27th of July, 1822, *Stansbury* executed the deed of mortgage, &c. That after the execution of the said mortgage, *Stansbury* con-tinued to present paper whereon he was drawer or endorser, for various amounts and at various times, with intent to have the same discounted for his use and benefit, which said paper was from time to time discounted, and portions thereof were also from time to time renewed by other notes. That these negotia-tions were continued until 1824, and in June and July of that year, *Stansbury* then stood indebted upon notes whereof he was drawer or endorser, viz. a note for $8700, drawn on the 17th June, 1824, by *Stansbury* in favor of J. P. cashier, at sixty days. A note drawn on the 12th of July, 1824, by *Stansbury* in favor of *Elizabeth Edwards* for $600, and endorsed by her, and *Wilmer* and *Palmer.* Three notes, the first dated the 8th of July, 1824, for $1800; the second dated the 14th June, for $1200, and the third dated the 19th of July for $700. All three drawn by *Elizabeth Edwards* in favor of *Stansbury,* and by him endorsed; and *Stansbury,* was also indebted to the said bank on two notes, the first drawn by *N. M. Bosley* in favor of *Stansbury* for $300, dated the 17th of June, 1824, and the other drawn by *J. Mediart* in favour of *Stansbury* for $200, dated the 17th of July, 1824, both of which notes were subse-quently paid by their respective drawers; but the other notes before mentioned never were paid to the bank, and still remain due and unpaid. That soon after the execution of the deed of mortgage, the respondent filed their bill for the foreclosure there-of, the same having become forfeit, and a decree by consent was accordingly obtained for a sale, &c. That the property was sold to the amount of $12,005 33. That the said sum was answerable for the payment of certain liens there out, which were to be paid before any portion of the above mentioned notes were entitled to be liquidated; which said liens con-

sisted of, &c. which said liens thus reduced the amount subject to the payment of the said notes to a sum less than $8000. That the sum thus left is not sufficient to pay the first note due by *Stansbury* for $8700. They utterly deny that there was any understanding or agreement between them and *Elizabeth Edwards* or *Stansbury*, that the mortgaged premises when sold should be applied to pay the notes whereof *Mrs. Edwards* was either drawer or endorser, or that any *pro rata* distribution of the fund should be made in her favor, or that there was any agreement or understanding between the said parties, *other than that recited in the said deed of mortgage.* They aver that in granting the discounts as aforesaid to *Stansbury*, they were regulated by their opinion of the solvency of *Mrs. Edwards*, in determining whether they would grant discounts with her name; and took her name as a further and additional security for the payment of the notes by *Stansbury*, lest the security of the mortgaged premises should be, as it turned out to be, insufficient for their indemnification against loss; and they would not have lent their money upon the security of *Mrs. Edwards's* name, if they had been apprized that she could or would claim any benefit from the security of the mortgaged premises, as she now pretends to do by her petition. They are advised that *Mrs. Edwards* has no right in equity or in law to claim a payment of the notes whereon her name appears, until all the liabilities which were intended to be secured by the said mortgage be first satisfied. *Prayer* that the petition be dismissed, and the respondents be permitted to take such benefit from the mortgage as they are entitled in equity and conscience to demand.

*Affidavits* were filed by *Mrs. Edwards;* one of them, that of *William Stansbury*, who made oath that *Mrs. Edwards* became drawer or endorser on notes discounted at the *Union Bank* for the accommodation of the deponent, some time in August, 1822; that her name was substituted upon said notes for *R. Middleton's*, who was considered as in bad credit; and that *Mrs. Edwards* consented to lend her name on said notes under the express assurance that the payment of them was fully secured by the mortgage deed of a large amount of property to the

said bank, which he believed would have been amply suffi-
cient to have secured the payment of all the notes at the said
bank, had it not been disposed of at an immense sacrifice.

BLAND, Chancellor, (April 28, 1826.) The matter now presen-
ted to the consideration of the court, arises out of the petition of
*Elizabeth Edwards* and the answer thereto of the bank. The
counsel on both sides have been heard, and the proceedings
considered.

It appears, that *Stansbury*, the defendant, with a view to ob-
tain such loans of money as he might want, on the 27th of July,
1822, mortgaged the whole of a considerable proportion of his
property to the *Union Bank*, the plaintiff; which, it was stip-
ulated should stand as a security for all and every sum or sums
of money then owing, or which might thereafter become due and
owing from *Stansbury* to the *bank*, either upon any pro-
missory note or notes, that had then been or might thereafter be
negotiated at the bank, of which he might be drawer or endor-
ser or otherwise howsoever. At the time this deed was made,
*Stansbury*, it is alleged, was indebted to the bank to the
amount of $15,000 and upwards, by notes, of which he was
either drawer or endorser; and some of which were endorsed
by *Elizabeth Edwards*, the petitioner. After which, on the
18th of December, 1822, the bank filed their bill here to have
the mortgage foreclosed; and on the 27th of the same month,
by consent, obtained a decree for a sale; and a sale has been
made accordingly. But notwithstanding this judicial proceed-
ing, the negotiations between these parties were, from time to
time, renewed and continued down to the month of July, 1824,
when it appears, that *Stansbury* stood indebted to the bank to
a considerable amount by promissory notes; one of which, dated
ion the 17th of June, 1824, for $8700, was given by *Stansbury*
directly to the bank itself without any endorser; all the other
notes were endorsed or drawn by other persons—the greater
amount by *Elizabeth Edwards*, the petitioner.

The case is somewhat complex; but it appears to me, to be
resolvable into this: The *Union Bank* is the creditor of *Stans-*

*bury* to a considerable amount, for the payment of the whole of which it holds a lien upon the mortgaged property, and for a part it holds the additional personal security of *Edwards's* endorsements of *Stansbury's* notes. This relationship of principal and debtor, and of a surety to a creditor who held a pledge of property as an additional security, existed, as relates to *Edwards*, on the execution of the mortgage deed, and has been, from time to time, revived, renewed, and continued ever since. I shall, therefore, consider these parties as now standing in this predicament and relation to each other.

The petitioner insists on having the proceeds of the mortgaged property, applied to the payment of the aggregate amount of debts due by *Stansbury* to the bank, as far as they will go, without distinction or discrimination. On the other hand, the bank contends for the right to apply those proceeds exclusively to the payment of *Stansbury's* note for $8,700, on which they have no endorser or other personal surety than *Stansbury* himself.

The relationship of creditor, principal debtor, and surety, lays the creditor under certain obligations, which he is not allowed by either a court of law or equity to violate with impunity. Although, as between obligee and surety, there is no obligation of active diligence against the principal; and delay, unaccompanied by fraud, or a positive agreement with the principal, will not operate as a release of the surety; yet, if a creditor undertakes, by express stipulation, to extend the time of payment, or to allow the principal to pay by instalment; or if the obligee begins to sue the principal and afterwards gives time; or if the creditor in any manner waives, or postpones his right to sue immediately the debt becomes due, the surety will be discharged, as well at law, as in equity. Because, immediately, on the next day after the debt becomes due, the surety has a right to file his bill here, to force the creditor to bring suit; and, therefore, an express and stipulated indulgence given by the creditor to his principal debtor is fatal to his claim against the surety, since it deprives him of this equity.

The taking of a mortgage by the creditor from the principal debtor, is calculated to inspire the surety with confidence. He is thereby induced to relax in his vigilance ; and to forbear obtaining a sufficient guaranty as an indemnity against his eventual liability.    Such a mortgage becomes a trust for the direct interest of the creditor, and also, for the direct benefit of the surety.    From such circumstances, therefore, an equity arises, that the creditor shall not invalidate, or by any wilful act vitiate his mortgage security to the prejudice of the surety.    And also, because the surety, should he be compelled to pay the debt, has a right to call upon the creditor to be put into his place, in all respects ; since, in equity, or such an event, he becomes entitled to be considered as the substitute of the creditor; and to have the mortgage, and all other securities given by the principal debtor, assigned to him.    And this right of the surety stands not upon any thing expressed in the contract, but is based upon the principles of natural justice.

The principles in relation to double securities and marshaling assets do not strictly apply ; but, they have a bearing which fortifies and illustrates the equity by which this case is governed.    In those cases, where a creditor has two funds, he shall take his satisfaction out of that fund upon which another creditor has no lien, or which he cannot reach.    This, however, is done for the benefit of *creditors*, not of the debtor, though it arises out of his acts, and he does receive benefit from it.    This doctrine, in relation to double securities, and marshaling assets, has been long established here; and is, I am inclined to believe, carried farther than in *England.*    To illustrate this matter, let us suppose, in this instance, that *Elizabeth Edwards* was dead, and that the proceeds of her real estate were now here to be distributed among her creditors.    If the bank were to present their claims, as founded on these notes of *Edwards*, endorsed as surety for *Stansbury*, the court would require them to show, that *Stansbury*, the principal debtor, was insolvent, before they would be allowed to come in for a distributive share of *Edwards's* assets.    This marshaling of the assets and securities would be made only, at the instance, and for the benefit of *Edwards's* cre-

ditors; yet her representatives might also receive material benefit.

But, in this case it is a *surety*, not a creditor, who asks to have the burthen of this claim shifted over from one point of pressure to another. It is the surety who wishes the creditor to be directed to take his satisfaction from his principal debtor, so far as he can obtain it, before he is allowed to demand payment of the surety. It is believed, that a Court of Equity has never, in any case, gone so far, at the instance of a surety, as to turn a creditor away from one fund upon which, according to the express terms of the contract, he had a fair and an unquestionable claim, to seek payment from another, as he could, and which might, or might not, be made effectual. Nothing can be more delicate than the interference, either of the Legislature or of the Court of Chancery, taking away those stipulated rights which the debtor has thought fit to grant. Such an arrangement, or marshaling of securities, it seems to me, would be pressing too closely upon that constitutional restriction, which forbids even our Legislature from impairing the obligation of contracts. The surety is the guarantee, and it is his business to see, whether the principal pays, and not that of the creditor.

But, where nothing is hazarded, and every thing may be attained which was contemplated by the parties, when they entered into the contract; in such case a court of equity may fairly, and safely interpose ; because, by doing so, it does not, in any sense, impair the obligation of the contract; but a new and equitable direction is given to it, for the prevention of wrong, and for the purpose of doing more ample justice to all. And, therefore, where it is shown, that the creditor has the clear means of making his demand effectual, and there is no risk, delay or expense; as when the money was in the next room, or an ample indemnification against the consequences of risk, delay and expense, the surety has a right to call upon the creditor to do the most he can for his benefit. As if the surety deposits the money, and agrees that the creditor shall be at no expense, he may compel the creditor to prove under a commission of bankruptcy, and give the benefit of the assignment to the sure-

ty in that way. Other examples might be adduced equally strong to show, that a creditor may, under circumstances, be called on to act for the benefit of the surety. In those cases, it is not by force of the contract; but of that equity upon which it is considered against conscience, that the holder of the securities should use them to the prejudice of the surety, where he himself can be exposed to no risk whatever.

Here it is clear, that the mortgage comprehends all the debts due by notes from *Stansbury* to the bank, as well those for which *Edwards*, as drawer or endorser, was surety, as all others. And it is certain, that the bank can run no risk in doing what is now asked; because the proceeds of the mortgaged property, are now in the hands of this court, or of the trustee, its officer, ready to be delivered over. To the extent of these proceeds, therefore, this creditor not only has the clear means, but the absolute certainty of rendering his demand effectual against his principal debtor. As the bank would not have been permitted to invalidate or enfeeble its mortgage to the prejudice of *Edwards*, so neither can they be allowed to shift and misapply its benefits to her disadvantage. If the bank chose to trust *Stansbury* on his note and mortgage alone, and they should sustain any loss, they have only themselves to blame. It is enough for *Edwards*, and sufficiently maintains her equity, that the bank cannot lose any portion of the debt for which she is surety, by having that pledged property first applied towards its satisfaction, since it clearly formed a part of that aggregate amount of debt, intended to be secured by the mortgage.

Upon the whole, it is my opinion, that the proceeds of this mortaged property, or so much thereof as may remain after all prior liens upon it have been fully paid, must be applied to the satisfaction of the total or aggregate amount of the sums of money due on notes by *Stansbury* to the bank; and that *Edwards*, as surety, is entitled to the equitable benefit of this application of these proceeds; and that she is liable to the bank for the balance and no more. As for example, if the bank should obtain from these proceeds only twenty-five cents in the dollar with interest, *Edwards* must be held liable for seventy-five cents in

the dollar with interest, to the amount of which she was surety and no more.

Wherefore it is ordered, that this case be, and is hereby again referred to the auditor, with directions to state an account or accounts according to the principles that have been thus explained and determined.

The complainants afterwards on the 17th of July, 1826, petitioned the Chancellor for leave to amend their answer to the petition of *Elizabeth Edwards* for the purpose of introducing therein a variety of facts which were unknown to the Chancellor at the time of the hearing, and that a re-hearing may be had, &c. Accompanying the petition were several affidavits, with a list of the notes drawn by the said *Edwards*, &c.

BLAND, Chancellor, (July 19th, 1826) after hearing the solicitor of the petitioners on the foregoing petition, and considering the same, together with the proceedings.—*Ordered*, that the said petition be dismissed with costs. From which several orders in the premises the complainants appealed to this court.

The auditor afterwards, on the 1st of May, 1827, reported an account, and thereby applied the nett proceeds of the sales, to the payment of the trustee's commission, costs of suit, ground rents and taxes, the prior mortgage to *Richard Sommerville*, and dividends on the amounts of the notes held by the bank.

The counsel of the parties entered into an agreement, after the appeal was depending in this court, "that the affidavits filed by the appellee in support of her petition, and those filed by the appellants with the petition of the 17th of July, 1826, be received as evidence in the cause, as if the same had been duly taken before the hearing of the same. And also the auditor's last report, be confirmed by the Chancellor, and be admitted as part of the record in this cause, as if the same had been done before the appeal was entered; and that all other audits be dispensed with."

BLAND, Chancellor, (25th June, 1828.) On consideration of the agreement this day filed,—*Ordered*, that the statement of the

auditor be ratified and confirmed; and the trustee directed to apply the proceeds accordingly, with a due proportion of interest that has been or may be received.

The cause was argued in part at June term, and concluded at the present term, 1828, before BUCHANAN, Ch. J. and ARCHER and DORSEY, J.

*Kennedy* for the appellants contended, that the Chancellor erred in his opinion as expressed in his orders in the cause, for the following reasons:

1. That *Mrs. Edwards,* who was the drawer of certain notes, which were discounted by the appellants for the use and benefit of *William Stansbury,* was not entitled to have the same admitted to a rateable dividend upon the mortgage fund, until the appellants were satisfied in their principal debt of $8700 against *Stansbury.*

2. That there was error in directing the account to be so stated, as to include the notes of *Mrs. Edwards,* the fund not being sufficient to pay the note of *Stansbury,* which had been discounted upon the security of the mortgaged premises alone.

3. That the Chancellor erred in supposing, against the facts of the case, that the notes of *Mrs. Edwards* were in existence at the date of the mortgage, and designed to be secured by it.

4. That he also erred in the opinion, that the appellants were guilty of any laches in availing themselves of the mortgage fund, to the prejudice of the appellee.

1. Parol evidence is admissible to explain an equitable mortgage; also, that an absolute deed was intended as a mortgage *Ex parte Langston,* 17 *Ves.* 227. *3 Stark. Evid.* 1052.

2. *Mrs. Edwards* has assumed the privilege of a surety. She cannot stand as a surety. He adverted to the case of *Clopper vs. Union Bank of Maryland,* 7 *Harr. & Johns.* 92. When the mortgage debt is paid, then the surety is to stand in the place of the creditor. *Mrs. Edwards* might come in for the surplus. *Hays vs. Ward,* 4 *Johns. Ch. Rep.* 123. *Cheesebrough vs. Millard,* 1 *Johns. Ch. Rep.* 409. *Stevens vs. Cooper, Ib.* 430.

*Wright vs. Simpson,* 6 *Ves.* 734. *Craythorne vs. Swinburne,* 14 *Ves.* 164.

3. The notes of *Mrs. Edwards,* were not a substitute in the place of the notes drawn or endorsed by *Middleton.* If they were, such substitute could not have been for more than $500.

4. He denies the want of due diligence on the part of the bank. There was no application made to the appellants by the surety to proceed against the principal. *Wright vs. Simpson,* 6 *Ves.* 734. *King vs. Baldwin,* 2 *Johns. Ch. Rep.* 554.

*R. Johnson,* for the appellee. 1. Assuming *Mrs. Edwards* to be a surety of *Stansbury,* and as such, that she would have been entitled to the benefit of the mortgage. Has she placed herself in a situation to claim the protection of this court? The debt has not been paid ; and the surety is entitled to the benefit of the pledge made for its payment to the creditor. *Hayes vs. Ward,* 4 *Johns. Ch. Rep.* 132. The proper time for applying to the Court of Chancery for apportionment has arrived. *Ex parte Langston,* 17 *Ves.* 227.

2. Is not *Mrs. Edwards* to be considered as a surety, and entitled to protection as such, though she was not known by the bank? *Clopper vs. Union Bank of Maryland,* 7 *Harr. & Johns.* 92. *Claythorne vs. Swinburne,* 14 *Ves.* 170. The mortgage being of record, showed to the world, that whatever note was drawn or endorsed by *Stansbury,* came within the provisions of the mortgage.

3. Is not *Mrs. Edwards* entitled to be protected by the mortgage, equally with the other endorsers of the notes of *Stansbury?* The mortgage was not to pay any *particular* note or debt then due to the bank; and in the answer of *Stansbury* to the bill filed against him for a foreclosure of the mortgaged premises, he stated that he owed the bank $20,000. The decree by consent, was, however, to pay the complainants not exceeding $19,258. This sum covered the whole amount of all the notes of *Stansbury,* including those drawn or endorsed by *Mrs. Edwards.* There is nothing in the mortgage to show that it was to secure the preferred debt of $8700, arising upon *Stansbury's*

note to the bank, on which there was no endorser; and no parol evidence can be admitted to contradict the mortgage.

4. The agreement relative to the evidence taken after the decree, was not intended that the whole of what was contained in the affidavits should be used as evidence; but only such as was legally admissible. A great part of the facts proved, do not apply to the issue between the parties. *Hayward vs. Carroll,* 4 *Harr. & Johns.* 521. *Jones vs. Slubey,* 5 *Harr. & Johns.* 382. *Westley vs. Thomas,* 6 *Harr. & Johns.* 24, 27. The evidence is that the mortgage was executed to secure a particular debt due at the time. In the answer to the appellee's petition in the case under the agreement, the bank prayed to amend it, which the Chancellor refused to grant. The evidence was inadmissible on the ground that it contradicted the mortgage. It changes the legal operation of a particular clause in the mortgage. *Westley vs. Thomas,* 6 *Harr. & Johns.* 27. *Watkins vs. Stockett, Ib.* 435. The mortgage was to secure *all notes* drawn or endorsed by *Stansbury.*

5. The evidence is sufficient to show that the notes drawn by *Mrs. Edwards,* were a substitute for the notes which had been drawn by *Middleton* in favor of *Stansbury,* and by him endorsed to the bank; and that the notes so drawn by *Middleton,* were in the bank at the time of the mortgage.

*Williams,* (District Attorney of U. S.) also for the appellee. The bank could not but know most of the transactions and intentions of the parties in 1822, rather than in 1826. The mortgage, bill, answer and decree were all in 1822, and show the clear understanding of the parties. *Middleton's* were clearly accommodation notes—commenced in 1821, and continued to August, 1822. They were then retired by *Mrs. Edwards's* notes, and not by the receipt of $9000. In *Baltimore* the borrowers on accommodation notes *generally,* almost universally appear as *endorsors* and not as drawers. All the notes are dated *two* years after the mortgage deed; and, therefore the *terms* of the mortgaged are insisted on. The notes of *Middleton* and of *Mrs. Edwards,* were expressly proved to be ac-

commodation notes, this was proved by *Stansbury.* Certain depositions were filed after the Chancellor had decreed on the proceedings under the petition of *Mrs. Edwards.* The deposition of *Pinkney* contradicts that of *Stansbury,* and is contradicted by all *probability* and *bank operations.* The deposition of *Stansbury* contradicts his former deposition, and is contradicted by the deposition of *Frisby,* which is mostly to be relied on —*Stansbury* is a director of the bank.

The bank cannot elect to apply this money. 1. Because the deed of mortgage forbids such election; and parol testimony is not admissible.

2. Because they signified a different election at the time of filing their bill, &c. *Ham. Dig.* 253. *Devaynes vs. Noble,* 1 *Meriv.* 608.

We appeal from the conduct of the bank in July, 1826, to their conduct in 1822; and insist on the decree of 1822. No parol understanding can be admitted to contradict the mortgage, bill, decree, &c. *especially* so as to affect third parties.

1. The bank do not pretend an ignorance that the notes of *Mrs. Edwards* were *accommodation* and not *real* notes, until *after* the decree of 1826. Yet *Mrs. Edwards* expressly states them to be accommodation notes in her first petition. But it is no matter whether the bank knew it or not, if they were *really* so. Her notes were *substituted* for those of *Middleton;* and are so proved. If they were not *substituted;* yet her notes are comprehended in the *terms* of the mortgage, bill, answer and decree, &c.

2. The bank had the power to limit *all* their discounts to within the value of the property; while *Mrs. Edwards* had no such control.

3. The late language of the bank, and *Pinkney's* deposition are inconsistent with their being *real* notes.

4. *Mrs. Edwards* is *prima facie* entitled under the mortgage deed; and she is only to be thrown out by being shown to be a debtor. She relied on the mortgage as recorded. She does not ask for the money, but only asks for its proper application.

*Taney* (Attorney General) in reply.

The question is, whether or not the fund arising from the sale of the mortgaged premises, is to be applied to the payment of a particular note, mentioned in the mortgage, or *pro rata*, to the payment of the whole of the notes?

The mortgage was given to secure the debt of $9000, and neither the Bank, or *Stansbury*, understood or intended, that any other note was to be paid, or secured by it, until after the payment of that debt. This is proved by *Pinkney* and *Stansbury*.

The mortgage was for the benefit of the Bank, and not for the securities.

1. Independent of the parol evidence, what is the effect of the mortgage?—it was taken by the bank for its own benefit, not to indemnify securities. The bank could never have intended to place themselves upon the footing, on which the decree has placed them. The liability of the endorsers, &c. was superadded to that of the mortgage. The endorsers have no equity—they were not deceived by the bank—the bank is not responsible for what *Mrs. Edwards* might have in view, or thought, or was informed on the subject, not proceeding from it, or its agency. The mortgage embraces all notes, whether *Stansbury* be drawer, or endorser, principal, or surety—suppose *Stansbury*, to be the endorser; then he is to come in, according to the decree as surety, and claim to be exempted *pro rata*—all securities are not of necessity to contribute *pro rata*, it depends upon the engagement entered into. *Craythorne vs. Swinburne*, 14 *Ves.* 160.

The mortgage was not to protect the securities at the expense of the bank.

Suppose *Stansbury* to be solvent, and able to pay his debts, could not the bank, go against *Mrs. Edwards*, and leave her to her remedy against *Stansbury*. She has no right to demand of the creditor any fund, until the creditor is satisfied. Could she come upon the fund, and compel the bank to proceed against *Stansbury*, if he was in a condition to pay?—4 *Johns. Ch. Rep.* 123, 124, 131. 2 *Johns. Ch. Rep.* 554.

*Mrs. Edwards's* notes were not substituted for those of *Middleton.*  *Mr. Pinkney's* evidence disproves that, and none of *Mrs. Edwards* notes correspond with *Middleton's.*

*Mrs. Edwards* was not a security on any of the notes when the mortgage was executed.  *Middleton's* was a *real* and not an accommodation note.

2. If the parol evidence is admissible, it is conclusive.  Is it admissible?—Between these parties it is, to shew what debt, it was the object of the mortgage to secure.  The mortgage is no estoppel as to *Mrs. Edwards*, as she was no party to it.  As between the immediate parties to the instrument parol evidence would be inadmissible; but the rule is different, as regards a stranger.  There can be no estoppel, unless it is mutual.  It operates between the parties to the instrument, but does not apply to strangers.  3 *Stark. Evid.* 1052, 1054.  *Craythorne vs. Swinburne,* 14 *Ves.* 159, 168, 170.

The parol evidence is not offered to contradict the terms of the mortgage; but in aid of it, to shew the amount of the sum raised—who were the drawers, and who the endorsers.

This is not a case in which a regular issue is joined.  A fund is in court, which two parties claim.  The question was how the fund was to be distributed?  Not to be placed before the court, by bill and answer, or any regular form of pleading.  Nothing more was necessary, than to state the ground, upon which each party, claimed the fund.

3. It is said the bank was too late.  That the decree for the sale changed the relative situation of the parties.

The Chancellor dismissed the petition of the bank, upon the ground that he had made up his opinion, as to the manner in which the fund should be distributed.

*R. Johnson* for appellee—In explanation of the rule as to the admissibility of parol evidence.  The rule in relation to parol evidence is, that no one of the parties to the written contract, can introduce it, especially as against strangers to it.  As between parties to the instrument, it might be admitted in some cases.  *Union Bank vs. Betts and wife,* 1 *Harr. & Gill,* 175.

DORSEY, J. delivered the opinion of the court. The rights of the parties in controversy in this cause, entirely depended upon the true construction of the mortgage from *William Stansbury to the Union Bank of Maryland*, bearing date the 27th day of July, 1822. Its objects as set forth in the recital, was to secure the payment to the *Union Bank of Maryland*, of all and every sum, or sums of money then owing, or which might thereafter become due or owing from the said *William Stansbury* to the said bank, upon any promissory note or notes negotiated, or to be negotiated, at that bank, of which he was or might be either drawer or endorser. He is described as a merchant of the city of *Baltimore*, and it is apparent that by the execution of this deed, he designed not only to provide an indemnity to the bank for what he already owed, but to obtain for himself a credit at that institution, which would induce a more free discount or negotiation of notes, on which *Stansbury's* name should appear as either drawer or endorser. Such a facility is an object of primary importance to him who is engaged in commercial pursuits. Its value to *Stansbury* is manifest, enabling him to obtain an immediate accommodation discount of nine thousand dollars on his own note, without an endorser. In litigating these rights, it is competent for either party to prove, what notes drawn and endorsed by *Stansbury*, and discounted at the *Union Bank*, existed on the 27th of July, 1822, when the mortgage was executed; and also all such as were negotiated at that bank, subsequently to that period. The first negotiation of *Elizabeth Edwards's* paper, was in September, 1822.

To this mortgage, *Stansbury* and the *Union Bank* alone were parties. Under it at law, no right was acquired, no interest passed; upon it, no action could be maintained but by the *bank*. All the circumstances which preceded its existence, and immediately followed its birth, demonstrate that the object of its execution was, not to indemnify those who were or might become his drawers or endorsers; but to ensure to the *Union Bank*, the payment of all notes negotiated by them, on which his name might appear either as maker or endorser. 'Tis

true, if the fund had been sufficient, those who were on his paper, would in equity be protected from loss. But this was a consequence, not the design of his act. The legal construction of this instrument, is in strict accordance with what we have stated as the manifest object of its creation Such being the posture of the parties at law; upon what principle is it, that a court of equity can be called on to change their condition? In construing agreements, it is said a Court of Chancery will sometimes adopt a more liberal and enlarged construction, than prevails at common law. But this latitude, if it exist at all, can never be tolerated, unless it be necessary to effectuate the motives which induced the contract. Here, no such necessity exists. The most perfect harmony prevails between the agreement executed, and the obvious intention of its framers. To adopt the interpretation of the mortgage, which was insisted on for the appellee, viz: that the property was conveyed to the bank, in trust to be appropriated rateably to the payment of all notes negotiated with them, of which *Stansbury* was either the drawer or endorser, would be to defeat a leading object of *Stansbury* in making the conveyance. Instead of giving additional credit to his name, and a consequent increase to his favors at the bank; it would have been the most effectual means which he could have adopted, to exclude himself from all further discounts. As he then stood, the payment of the nine thousand dollar note, was amply covered by the property mortgaged. But every additional discount in proportion to its amount, reduced the security for the payment of that note. So that should the *bank* have increased their accommodations to *Stansbury* to ninety thousand dollars, they would thereby have relinquished nine-tenths of the security, which they had previously held for the payment of the note of nine thousand dollars. Nay, such are the positive terms of this deed, if clothed with the attributes of a deed of trust, which are attempted to be affixed to it, that should *Stansbury*, holding a real note of the most opulent merchant in Baltimore, have obtained its discount at the *Union Bank*, *eo instanti*, such merchant might demand its entire, or *pro rata* payment out of *Stansbury's* mort-

gaged estate. The deed providing, not merely for the payment of notes negotiated for the account or accommodation of *Stansbury*, but of all notes bearing *Stanbury's* name, no matter for whom discounted.

The attempt to sustain the claim of the appellee by the doctrine of substitution, is equally untenable. Such relief is never extended to a security, but upon the assumption that the creditor's debt has been, or is to be fully paid: that his further detention of the mortgaged property is against equity and good conscience. Can it be deemed an equitable substitution, which whilst it left in full force and unsatisfied, the just claims of a creditor, should wrest from him the fund specifically pledged for their payment, and leave him destitute of any other source to which he might apply for indemnity? If after satisfying all debts due to the *Union Bank* on *Stansbury's* notes by them discounted, there should remain a surplus of the mortgaged fund, to that amount, might the drawers and endorsers of his accommodation notes, who had made payments to the *Union Bank*, seek to be substituted?

The order of the Chancellor ratifying the auditor's statement, making a rateable distribution of the proceeds of sale of the mortgaged premises, between *Elizabeth Edwards*, and the *Union Bank of Maryland*, is reversed with costs, so far as regards the application of the funds to the payment of *Stansbury's* notes negotiated at said bank. The order, so far as it ratifies the residue of said statement, is affirmed.

This court will sign an order or decree, directing the trustee to pay the amount thus applied to the *Union Bank of Maryland* on account of *William Stansbury's* notes to them for $8700.